UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Yvonne Fleming,                                06-CV-6357
                            Plaintiff,         (CPS)(JMA)

        - against -
                                               MEMORANDUM OPINION
MaxMara USA, Inc., John Gleeson, and           AND ORDER
Luigi Caroggio,

                            Defendants.

----------------------------------------X

SIFTON, Senior Judge.

    On November 29, 2006, plaintiff Yvonne Fleming commenced

this action against defendants MaxMara USA, Inc. ("MaxMara"),

John Gleeson, and Luigi Caroggio.  Plaintiff asserts claims of

(1) discrimination on account of her race, (2) race-based hostile

work environment, and (3) retaliation in violation of Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e

*et seq.* ("Title VII") and the New York City Human Rights Law, New

York City Administrative Code §§ 8-107 *et seq.* ("NYCHRL").[1]

Presently before this Court is defendants' motion for summary

judgment.  For the reasons that follow, defendants' motion is

granted.

## BACKGROUND

    The following facts are drawn from the parties' submissions

---

[1] The Amended Complaint also asserts a claim arising under § 510 of the
Employee Retirement Income Security Program ("ERISA"), 29 U.S.C. § 1140, but
plaintiff withdrew this claim during briefing of defendants' motion for
summary judgment.

in connection with this motion.  Disputes are noted.

Plaintiff is an African-American woman and a former Director of Human Resources and Payroll for defendant MaxMara.  Affidavit of Luigi Caroggio ("Caroggio Aff.") ¶¶ 20-21; Am. Compl. ¶ 1. Defendant MaxMara is a wholly owned United States subsidiary of MaxMara Fashion Group S.r.L., a privately owned women's apparel company based in Italy, which employs approximately 300 people in the United States.  Caroggio Aff. ¶¶ 13-14.  Defendant Gleeson is the former Vice President of Finance for defendant MaxMara. Affidavit of John Gleeson ("Gleeson Aff.") ¶ 1.  Defendant Caroggio is currently the Chief Executive Officer of defendant MaxMara, where he formerly served as Vice President of Operations from May 2003 until his promotion to Chief Executive Officer in January 2008.  Caroggio Aff. ¶ 1.

On December 4, 2000, Guglielmo Melegari, then-President of MaxMara, hired plaintiff on an "at-will" basis to serve as MaxMara's Director of Human Resources and Payroll, a newly created position.  Deposition Testimony of Guglielmo Melegari ("Melegari Dep.") at 15:4-16:3; Caroggio Aff. ¶ 21.  At that time, plaintiff did not (and does not currently) possess a college degree, but had 13 years of experience working in payroll and human resources in the retail industry.  Deposition Testimony of Yvonne Fleming ("Pl. Dep.") at 10:5-8; 23:11-23.  At MaxMara, plaintiff reported both to Mr. Melegari and defendant Gleeson,

then-Vice President of Finance for MaxMara. *Id.* at 25:4-5.

On February 1, 2001, plaintiff met with Sandy Ost, then Assistant Treasurer of MaxMara, in Ms. Ost's office. Pl. Dep. at 99:13-23; Am. Compl. ¶ 28. Defendant Gleeson was also present. *Id.* According to plaintiff, the purpose of the meeting was to discuss a change plaintiff wished to make to the payroll system. Pl. Dep. at 99:20-23. Plaintiff testified that during the meeting, defendant Gleeson, allegedly because he was "upset about all the changes [plaintiff] was making throughout the company," made the following statement: "one day we are going to come in and there's going to be a rope hanging from the ceiling and guess who is going to be hanging from it." *Id.* at 103:5-18. Plaintiff testified that defendant Gleeson and Ms. Ost burst out laughing following the statement. *Id.* Defendant Gleeson denies ever making the statement or any other racially charged remarks to plaintiff. Gleeson Aff. ¶ 23.[2] According to plaintiff, Mr. Melegari, plaintiff, and defendant Gleeson met the following day to discuss the incident, at which time Mr. Melegari reprimanded defendant Gleeson. Pl. Dep. at 113:18-115:9. Mr. Melegari does

---

[2] In her Local Rule 56.1 Statement, plaintiff cites a submission made by defendant MaxMara to the New York State Division of Human Rights, which includes Ms. Ost's recollection that defendant Gleeson made a comment about a rope. Affidavit of Denise K. Bonnaig ("Bonnaig Aff."), Ex. 23 at 5 (copy of MaxMara's submission). The submission further states that according to Ms. Ost, the comment was not directed toward plaintiff, nor was it racial in character. *Id.* I note, however, that neither party has submitted an affidavit by Ms. Ost in connection with this motion, and that Ms. Ost's comments are inadmissible on summary judgment to the extent that they are not party admissions by defendant MaxMara, a factual issue not resolved by the parties' submissions.

not recall a meeting relating to defendant Gleeson's alleged remark, but did testify that he remembers "having at least a meeting with [plaintiff] and [defendant Gleeson] at the beginning [of plaintiff's tenure at MaxMara] relating to the problems that came from creating this new position." Melegari Dep. at 27:2-7.

According to plaintiff, defendant Gleeson targeted plaintiff and her subordinates, two of whom were also African American, for poor treatment during plaintiff's tenure at MaxMara. For example, plaintiff alleges that defendant Gleeson excluded her from meetings she should have attended or conducted in her official capacity, Pl. Dep. at 152:2-156-12, excessively criticized her work on MaxMara's Employee Manual, *id.* at 159:3-160:20, and sent rude emails to her, *id.* at 178:11-185:16. In her Amended Complaint, plaintiff alleges that defendant Gleeson refused to answer work-related questions, arbitrarily imposed Finance Department duties on her, and insulted her in front of the whole office by stating he was "washing his hands off" of her. Am. Compl. ¶ 21. Plaintiff also testified that defendant Gleeson yelled at her staff and threw books at them. Pl. Dep. at 120:13-19.[3] Defendant Gleeson denies that any of his interactions with plaintiff were disrespectful in nature or in any way connected to her race. Gleeson Aff. ¶ 20.

---

[3] In her affidavit, plaintiff refers to statements made by her subordinate, Anesta Barrett-June, regarding defendant Gleeson's alleged poor treatment of her. Because Ms. Barrett-June's statements as included in plaintiff's affidavit are hearsay, I do not include them here.

It is undisputed that in 1996, defendant Gleeson hired Katie
Uyo, a native African woman, to assume a position reporting to
him in the Finance Department of MaxMara.[4]  Affidavit of Katie
Uyo ("Uyo Aff.") ¶¶ 2, 7.  Ms. Uyo worked for MaxMara throughout
plaintiff's tenure there and continues to work for MaxMara.  *Id.*
¶ 1.  Plaintiff states that at some point in time, Ms. Uyo told
her "to be submissive to Defendant Gleeson and 'yes yes yes him
to death.'"  Pl. Aff. ¶ 6.  Ms. Uyo denies ever having told
plaintiff that non-Caucasian employees are expected to play a
submissive role with defendant Gleeson, or that they are expected
to "yes him" all the time.  Uyo Aff. ¶ 21.

According to defendants Caroggio and Gleeson, during an
incident shortly before January 2004, plaintiff failed to follow
company protocol regarding internal employee transfers.  Caroggio
Aff. ¶¶ 37-40; Gleeson Aff. ¶ 8.  At that time, plaintiff decided
to transfer Luisa Yonzon,[5] an Accountant Clerk who reported
directly to defendant Gleeson, to plaintiff's own department, and
to hire another individual, Ma Lorraine De La Rosa Ramos, to
replace Ms. Yonzon in Accounting.  Gleeson Aff. ¶ 8.  According
to defendants Gleeson and Caroggio, MaxMara's practice regarding

_____

[4] The parties dispute whether Ms. Uyo is or was defendant Gleeson's non-
executive "assistant," or whether Ms. Uyo held a leadership position at
MaxMara from the time she was hired.  This dispute is immaterial.

[5] Elsewhere in the record, "Luisa Yonzon" is referred to as "Sarah
Yonzon" or "Sarah Luisa Yonzon."  *Compare* Gleeson Aff. ¶ 8 (referring to "Luisa
Yonzon") *with* Pl. Dep. at 207 (referring to "Sarah Yonzon") *and* Melegari Dep
at 35:16 (referring to "Sarah Luisa Yonzon").

internal transfers is that the heads of the incoming and outgoing departments must sign off on transfers before they are approved. *Id.*; Caroggio Aff. ¶ 38. Likewise, MaxMara requires that all department heads pre-approve new hires coming into their departments. *Id.* Defendants Gleeson and Caroggio state that plaintiff failed to secure defendant Gleeson's approval or even his knowledge prior to the transfer of Ms. Yonzon and the hire of Ms. Ramos. *Id.*

Plaintiff concedes that she effected the transfer and the new hire, but denies that she breached company protocol. Plaintiff testified that prior to transferring Ms. Yonzon, she spoke with both defendants Gleeson and Caroggio, along with other MaxMara employees including former President Melegari, and that "everybody blessed" the transfer. Pl. Dep. 207:19-210:10. Mr. Melegari signed a form dated February 5, 2004 approving the transfer, Bonnaig Aff Ex. 8 (copy of form), but recalled at his deposition that although he "agreed in principle with the move, [he] believe[d] [he] was presented after the fact with everything that was done and [he] was not pleased with the process, not the final outcome or final result." Melegari Dep. at 75:11-16. Defendant Gleeson denies that plaintiff secured his prior approval. Gleeson Aff. ¶ 8.

Defendant Caroggio states that when Mr. Melegari learned about the transfer incident involving plaintiff and Ms. Yonzon,

he "berated [defendant Caroggio] for allowing [plaintiff] to

breach Company protocol." Caroggio Aff. ¶ 39. In response, in

January 2004, defendant Caroggio drafted an email to Mr. Melegari

in Italian. *Id.* ¶ 40. The email was sent only to Mr. Melegari.

*Id.; see also id.* Ex. 15 (copy of email). According to

plaintiff's translator, the email includes the following

statement:

> On the other question, Yvonne (Director of HR!!!!!!!!)
> contacted Luisa without anyone's authorization and I, when I
> heard about it, did not want to dispute it because
> a) I thought you had approved it,
> b) The substitution did not generate additional costs to the
> departments for which I am responsible
> c) I don't want to obstruct the enthusiasm demonstrated by
> Luisa towards the new opportunity.
> Now I have the duty of calling you every time Yvonne goes to
> shit!! Instead of breaking my balls teach good manners and
> proper behavior to your ass-licking partners.

Bonnaig Aff. Ex. 24 (copy of English translation of email).

According to plaintiff, in addition to referring to

plaintiff as an "ass-licking partner" in the January 2004 email,

defendant Caroggio also generally treated her as if she were

subservient to him. Pl. Dep. at 194:14-197:6. For instance, she

testified that he at times ordered her to perform tasks not

within her job description. *Id.* In addition, she alleges that

when she attempted, at defendant Gleeson's direction, to correct

errors in defendant Caroggio's employment paperwork relating to

social security taxes, defendant Caroggio became enraged, blamed

her for creating problems, and refused to cooperate in rectifying

the tax issue until Mr. Melegari intervened.  Am. Compl. ¶¶ 50-56.

In August of 2004, one of MaxMara's employees committed suicide.  Caroggio Aff. ¶ 34.  In response, plaintiff called a firm-wide meeting to discuss the incident.  *Id.*  According to plaintiff, Mr. Melegari instructed her to convene a meeting in order to explain what had happened.  Pl. Dep. at 81:23-82:11. Defendants Caroggio and Gleeson state, however, that plaintiff did not clear the meeting's content with senior management beforehand, and that at the meeting, plaintiff "went so far as to attribute the employee's suicide to alleged mistreatment the employee had received from specific co-workers," adding, "and you know who you are."  Gleeson Aff. ¶ 7; Caroggio Aff. ¶ 34. Plaintiff denies having made any comment that could be interpreted as accusing specific employees of mistreatment that may have contributed to the suicide.  Pl. Dep. at 82:24-83:10.

In January of 2005, Emmi Haddock, MaxMara's Director of Sales, circulated a firm-wide email announcing a promotion of one of her subordinates, in contravention of company policy directing that such announcements should be made by plaintiff.  Caroggio Aff. ¶ 32; *see also id.* Ex. 12 (copy of Ms. Haddock's email).  In response, plaintiff sent a firm-wide email that stated the following:

Emmi:
I am sure that your employee is grateful to your company
wide email announcement that you have sent out today.
However, I need to remind you that it isn't your
responsibility to do so.  I sent out a memo . . . apprising
you that any announcements in new hires are done via my
office. . . . What I fail to understand is, either your lack
of regard for procedures or that you didn't comprehend the
memo.
I therefore recommend, that in the future, should you be
confused as to the purpose, content, meaning, request, etc.,
etc. of any memos or emails generated from my office, do
feel free to call my office and I shall have the pleasure of
simplifying it for you.

Caroggio Aff. Ex. 12 (copy of email).

At his deposition, defendant Caroggio testified that he
complained to Mr. Melegari about plaintiff's handling of the 2004
employee suicide incident and plaintiff's 2005 public email
exchange with Ms. Haddock.  Deposition of Luigi Caroggio
("Caroggio Dep.") at 130:7-158:21.  He also testified that during
plaintiff's tenure at MaxMara, at executive meetings attended by
himself, Mr. Melegari, defendant Gleeson, and others, complaints
were voiced concerning plaintiff's job performance.  *Id.* at
113:22.

Also in January of 2005, plaintiff received an oral
performance review from Mr. Melegari for the year 2004, following
which Mr. Melegari recommended only a small raise for plaintiff.
Caroggio Aff. ¶ 25.  In response, plaintiff submitted a
memorandum dated January 21, 2005 to Mr. Melegari in order "to
set the record straight" and to submit "rebuttals" concerning the
issues Mr. Melegari raised during the review.  *Id.* Ex. 10 (copy

of memorandum).  Among other things, plaintiff discussed the employee suicide incident, her communication skills, and her view that her performance had been negatively affected by her exclusion from meetings where she should have been present.  *Id.* Plaintiff did not discuss or allege any discrimination in the memorandum.  *Id.*  At her deposition, however, plaintiff testified that she had at other times complained orally to Mr. Melegari about defendant Gleeson's alleged discrimination against her, but that the complaints were not reduced to writing because Mr. Melegari said he would "take care of it."  Pl. Dep. at 234:1-235:13.

In April of 2005, Mr. Melegari either resigned or was forced out of his position as President of MaxMara.  Caroggio Aff. ¶ 27; Pl. Dep. at 75:11-76:8.  In May of 2005, defendant Caroggio assumed the position of acting President of MaxMara.  Caroggio Aff. ¶ 1.  One of defendant Caroggio's first acts upon assuming his new position was to hold individual meetings with senior executives, including plaintiff, to discuss their concerns about the direction or future of MaxMara.  *Id.* ¶ 28.

In preparation for her meeting with defendant Caroggio, plaintiff prepared a one-page memorandum dated May 11, 2005.  *Id.* Ex. 11 (copy of memorandum).  Plaintiff's memorandum included five points, the first of which stated: "Concerned about the direction/future of the Company[,]" and the remainder of which

discussed issues relating solely to plaintiff's duties and benefits as Director of Human Resources and Payroll.  *Id.* Plaintiff testified that at her meeting with defendant Caroggio, while discussing the first point on the "direction/future of the Company[,]" she complained that Italian employees were receiving preferential treatment over American employees.  Pl. Dep. at 213:10-16.  According to plaintiff, following Mr. Melegari's departure, at least nine individual employees orally complained to her about preferential treatment of Italians over Americans at MaxMara.[6]  *Id.* at 214:17-216:3.  Plaintiff testified that she relayed these complaints to defendant Caroggio at their meeting in May 2005, and that defendant Caroggio wrote them down.  *Id.* at 225:18-226:21.  Defendant Caroggio testified that he has no recollection of plaintiff having voiced such complaints to him during the meeting, Caroggio Dep. at 164:15-166:7, but stated that he "was aware that there was somebody saying, within the organization, that they felt the Italians were being given preferred treatment."  *Id.* at 167:10-12.

In June of 2005, defendant Caroggio decided to terminate plaintiff's employment.  Caroggio Aff. ¶ 29.  Defendant Caroggio states that his decision was based on his view that there was a

---

[6] The only sworn statement plaintiff has submitted in support of this assertion is that of Marcia Smith, who was a MaxMara employee at the time of Mr. Melegari's departure.  At her deposition, Ms. Smith testified that she complained to plaintiff that she thought she was paid less than other employees because of her ethnicity and gender, and possibly because she was not Italian.  Deposition of Marcia Smith ("Smith Dep.") at 55:7-57:6.

need to upgrade plaintiff's position, as well as his perception that plaintiff's "inappropriate, insensitive, or otherwise disproportionate conduct towards other employees had demonstrated to [him] that she lacked the judgment needed for the role[.]" *Id.* ¶ 31. Defendant Caroggio further states that his decision to terminate plaintiff's employment had nothing to do with her race. *Id.* ¶ 30. According to Peri Bandazian, a former MaxMara employee, following Mr. Melegari's departure, defendant Caroggio terminated two American employees in leadership positions (one of whom was plaintiff) and "was going to bring over anybody and everybody from Italy and that was it." Deposition Testimony of Peri Bandazian ("Bandazian Dep.") at 59:3-60:13; 100:7-102:17.

At about the same time, defendant Caroggio terminated a company executive, Adriana Kyzyk, without consulting or informing plaintiff. At his deposition, defendant Caroggio reportedly testified that upon the advice of counsel, plaintiff was not authorized to terminate Ms. Kyzyk, although terminating employees was one of plaintiff's key duties. Caroggio Dep. at 187:21-92:6.[7] In addition, plaintiff testified that on June 23, 2005, defendant Caroggio accused her of having engaged in illegal

---

[7] This portion of defendant Caroggio's deposition testimony was not made available to this Court, but is cited in plaintiff's memorandum of law in opposition to this motion. *See* Pl.'s Mem. In Opp. at 28. In any case, as set forth in more detail below, the circumstances of Ms. Kyzyk's termination are immaterial because even accepting plaintiff's version of the facts as true, defendants' failure to allow plaintiff to participate in terminating Ms. Kyzyk's employment does not rise to the level of a material adverse employment action capable of supporting a retaliation claim under federal or city law.

behavior by processing an out-of-plan medical claim on behalf of
Mr. Melegari.  Pl. Dep. at 334:15-338:18.  According to
plaintiff, however, processing out-of-plan claims on behalf of
the president of MaxMara was a common practice, and the claim
related back to 2004, when Mr. Melegari was president.  *Id.* at
336:10-12; 338:18-339:23.  Plaintiff also testified that
defendant Gleeson had previously processed out-of-plan claims for
Mr. Melegari. *Id.* at Tr. 338:19-20.

Following defendant Caroggio's decision to terminate
plaintiff, defendant Caroggio asked defendant Gleeson to find a
replacement for plaintiff's position.  Caroggio Aff. ¶ 29.
According to defendant Gleeson, the outplacement arm of Right
Management,[8] an employment placement firm, provided him with the
resume of Lisa Derrick as a potential replacement candidate.
Gleeson Aff. ¶ 26.  After reviewing Ms. Derrick's resume,
defendant Gleeson set up an interview with her.  *Id.* ¶ 27.  At
this time, defendant Gleeson was, by his own account,  unaware
that Ms. Derrick was African-American.  *Id.*  Defendant Gleeson
states that among the criteria influencing his decision to
interview (and later hire) Ms. Derrick were (1) her college
degree in Human Resources Management; (2) her 13 years of
experience in human resources; and (3) her promotion over time by

---

[8] The parties dispute whether Right Management or some other firm
introduced defendant Gleeson to Ms. Derrick.  This dispute is immaterial.

her previous employer from Human Resource Specialist to Vice President.  *Id*. ¶¶ 28-29.

On Friday, July 15, 2005, defendant Caroggio informed plaintiff that her employment at MaxMara was being terminated. Caroggio Aff. ¶ 43.  Defendant Gleeson attended the termination meeting, but according to both individual defendants, he was not involved in the decision to terminate plaintiff.  *Id.;* Gleeson Aff. ¶ 5.  Plaintiff alleges that defendant Gleeson was involved in the decision to terminate her, as shown by his participation in the termination meeting, his signature on her termination form, Caroggio Aff. Ex. 5 (copy of form), and the fact that he watched her "like a hawk" as she packed up her belongings. Bonnaig Aff. Ex. 3 (Affidavit of Marcia Smith) ("Marcia Aff.") ¶ 14.  According to Marcia Smith, an African-American woman formerly employed at MaxMara, when plaintiff was fired, she went to plaintiff's office, and defendant Gleeson told Ms. Smith "to make sure everything [plaintiff] takes, is hers and not the company's."  *Id.*  Ms. Smith also states that defendant Caroggio told her that plaintiff had been offered ten weeks of severance pay and that if plaintiff "fought this, she'd be sorry."  *Id.*

On Monday, July 18, 2005, Lisa Derrick was hired as the new Director of Human Resources and Payroll for MaxMara, a position she retains today.  Caroggio Aff. ¶ 44.  Both defendant Caroggio and defendant Gleeson participated in the determination to hire

Ms. Derrick. *Id.* ¶ 46; Gleeson Aff. ¶¶ 28, 34.[9]

On December 6, 2005, plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("SDHR"). Caroggio Aff. Exs. 1-3 (copy of complaint and supporting chronology of events). On July 17, 2006, plaintiff's SDHR complaint was dismissed for "administrative convenience" due to plaintiff's stated intention to file a complaint in federal court. Affidavit of Alyssa N. Koerner, Ex. 3 (copy of SDHR Order of Dismissal).

On November 29, 2006, plaintiff commenced this action. After defendants moved for summary judgment on April 11, 2007, plaintiff requested discovery, and on May 21, 2007, Magistrate Judge Azrack granted plaintiff's request. Defendants withdrew their first summary judgment motion without prejudice on June 7, 2007. Following discovery between the parties, on January 23,

---

[9] In her brief, plaintiff refers to a statement allegedly made by defendant Gleeson concerning the circumstances of Ms. Derrick's projected employment with MaxMara and its relationship to this action, to the effect that Ms. Derrick's employment would be terminated upon the conclusion of this lawsuit. At her deposition, Ms. Bandazian testified that an individual named Nessy Rivera told her that defendant Gleeson had made a statement to this effect to Ms. Rivera. Bandazian Dep. at 103:14-104:12. If defendant Gleeson had made the statement directly to Ms. Bandazian, the statement would be admissible as a non-hearsay admission of a party opponent. Fed. R. Evid. 801(d)(2). However, because no basis has been shown for classifying Ms. Rivera's statement to Ms. Bandazian either as nonhearsay or as an exception to the hearsay rule, Mr. Gleeson's alleged statement to Ms. Rivera is inadmissible. *See, e.g.*, *Pittman by Pittman v. Grayson*, 149 F.3d 111, 124 (2d Cir. 1998). Because hearsay that would not be admissible at trial is likewise not competent evidence on a motion for summary judgment, *see, e.g.*, *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999), I do not consider it here. Further, at her deposition, Ms. Rivera denied that defendant Gleeson made the alleged statement to her. Deposition Transcript of Nessie Rivera ("Rivera Dep.") at 20:21-25.

2009, defendants filed the present motion for summary judgment.

**DISCUSSION**

I.    Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003).  A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987).  In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact.  Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts.

*See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

In employment discrimination cases, district courts must be "especially chary in handing out summary judgment . . . because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996). "Employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999) (citations omitted). Direct evidence of discrimination is therefore not required. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d

Cir. 2000) ("an employer who discriminates against its employee is unlikely to leave a well-marked trail"). However, as a general rule, "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d. Cir. 1985).

## II.  Federal (Title VII) Claims[10]

Title VII prohibits employment discrimination based upon, among other things, an individual's race and national origin. 42 U.S.C. § 2000e-2(a). Plaintiff argues that defendant MaxMara, in violation of Title VII: (1) discriminated against her on account of her race, (2) subjected her to a hostile work environment on account of her race, and (3) retaliated against her for complaining about the preferential treatment of certain employees over others based on their national origin.

## A.  Race Discrimination

To survive a motion for summary judgment on a Title VII discrimination claim, a plaintiff must satisfy a three-part burden-shifting test. First, the plaintiff must establish a *prima facie* case of discrimination by offering "evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Int'l*

---

[10] There is no individual liability under Title VII, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74-75 (2d Cir. 2000), and accordingly, plaintiff has only asserted her Title VII claims against defendant MaxMara.

*Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 358 (1977). The establishment of a *prima facie* case creates a presumption of discrimination which shifts the burden of proof to the defendant. In order to rebut this presumption, the defendant must present a legitimate, non-discriminatory reason for the adverse employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). At that point, assuming defendant offers a legitimate reason for its actions, the burden shifts back to the plaintiff to prove that the defendant's articulated rationale is a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 806 (1973). The plaintiff, with admissible evidence, "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

To make out a *prima facie* case of discrimination in violation of Title VII, the plaintiff bears the burden of introducing evidence that would, if credited, establish: "1) that [s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Id*. An "adverse employment action" is one

which is "more disruptive than a mere inconvenience or an
alteration of job responsibilities." *Id.* (internal citations
omitted).

There is no dispute that plaintiff, as an African-American
woman, is a member of a protected class, and that her discharge
qualifies as an "adverse employment action."  I will assume for
the purposes of this motion that plaintiff was qualified for the
position she held.[11]  However, I conclude that plaintiff cannot
demonstrate that she was discharged under circumstances giving
rise to an inference of discrimination.

Upon her termination, plaintiff was immediately replaced by
Ms. Derrick, an African-American woman.  Where a member of the
plaintiff's protected class is contemporaneously hired as a
replacement, the offering of "proof of intentional discrimination
appears extremely difficult, if not practically impossible."
*Estepa v. Shad*, 652 F.Supp. 567, 571 n.5 (E.D.N.Y. 1987).  *See
also Umansky v. Masterpiece Int'l Ltd.*, No. 96 Civ. 2367, 1998 WL
433779, at *3 (S.D.N.Y. July 31, 1998) ("fact that plaintiff was
replaced by another [member of same class] weighs heavily against
an inference that [plaintiff] was discriminated against") *quoted
in Perez v. Int'l Bhd. of Teamsters*, No. 00 Civ. 1983, 2004 WL
1824100, at *13 (S.D.N.Y. Aug. 16, 2004).  While plaintiff

_____

[11] The parties dispute whether plaintiff was adequately qualified.
Def.'s Mem. In Supp. at 14 n.11; Pl.'s Mem. In. Opp. at 47.  In light of my
conclusion that plaintiff has failed to establish the fourth prong of a *prima
facie* case of race-based discrimination, I need not resolve this dispute.

speculates that Ms. Derrick's hire as her replacement was merely a pretextual device designed to disguise defendants' discriminatory intent in terminating her, she has no evidence to support such an hypothesis, and her citation of cases in which the replacement was hired after a discrimination claim had been filed only emphasizes the gap in proof. *See, e.g.*, *Burger v. Litton Indus.*, No. 91 Civ. 0918, 1996 WL 421449, at *12 (S.D.N.Y. Apr. 25, 1996) (same-class replacement "does not in itself rebut discriminatory intent, in light of the fact that [defendant] was aware of the pending Title VII case against it"); *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1534-36 (11th Cir. 1984) (same); *Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959, 964 (5th Cir. 1981) (same). Where, as here, a replacement of the same protected class was hired immediately following a plaintiff's termination and prior to the filing of a discrimination claim, it is indeed "extremely difficult, if not practically impossible" for a plaintiff to establish that her termination occurred under circumstances giving rise to an inference of discrimination.

Here, plaintiff has come forward with no evidence that race played any role in her termination. Indeed, she incorrectly argues that she "does not have to prove that her termination was racially motivated" in order to sustain a race-based

discrimination claim.[12]  Pl. Mem. In. Opp. at 47.  With no

evidence supporting an inference that plaintiff's termination

occurred on account of her race, and in light of plaintiff's

immediate replacement by a person of plaintiff's same race and

gender, plaintiff has failed to establish a *prima facie* case of

race discrimination.

B.   <u>Hostile Work Environment</u>

     The Supreme Court has interpreted Title VII to prohibit

"requiring people to work in a discriminatorily hostile or

abusive environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S.

17, 21 (1993)(citing *Meritor Savings Bank, FSB v. Vinson*, 477

U.S. 57, 64 (1986)).  To make out a successful hostile work

environment claim, a plaintiff must show that "the workplace is

permeated with discriminatory intimidation, ridicule, and insult,

that is sufficiently severe or pervasive to alter the conditions

of the victim's employment."  *Id.* (citations omitted); *accord*

*Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  The

conduct must create an "objectively hostile or abusive work

environment," and the victim must "subjectively perceive the

environment to be abusive."  *Id.*  A court determines whether an

environment is objectively hostile "only by looking at all the

---

[12] At times in her memorandum of law, plaintiff appears to conflate her
race-based discrimination claim with her national-origin-based retaliation
claim, both of which are predicated on her allegedly unlawful termination.
For the purposes of this motion, I consider plaintiff's allegations and
arguments as they relate to both claims, regardless of the context in which
they appear in her complaint and submission in opposition to this motion.

circumstances." *Id*. at 23. Factors to consider in this determination include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Isolated incidents of offensive conduct are generally inadequate to establish a hostile work environment claim; plaintiff must show "either a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted" to cause a change in the work environment. *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted).

Although "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred," they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. College of Staten Island*, No. 01 CV 7550, 2003 WL 21143076, at *2 (E.D.N.Y. Mar. 28, 2003) (citing *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001)). "Everyone can be characterized by . . . race . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or

correlation to the claimed ground of discrimination." *Alfano*, 294 F.3d at 377. Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Id.* at 378.

After establishing that a hostile work environment resulting from discrimination exists, a plaintiff must show that there is a basis for imputing the discriminatory conduct to her employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996). Where co-worker harassment is alleged, the plaintiff must establish that her employer knew or reasonably should have known about the harassment and failed to take reasonable remedial action. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004). By contrast, if the plaintiff claims that her supervisor perpetrated the harassment, the employer will be liable unless it establishes as an affirmative defense that (1) it exercised reasonable care to prevent and promptly correct any objectionable behavior; and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities offered by the employer or failed otherwise to avoid harm. *See id.*

The great majority of plaintiffs' allegations in support of her hostile work environment claim are facially race-neutral.

For instance, plaintiff complains that defendant Gleeson excluded her from meetings she should have attended or conducted in her official capacity, excessively criticized her work, sent rude emails to her, refused to answer work-related questions, arbitrarily handed off duties to her, and publicly insulted her by stating he was "washing his hands off" of her. Plaintiff also testified that defendant Gleeson yelled at her staff, who were African-American, and threw books at them. With regard to defendant Caroggio, plaintiff complains that he treated her as if she were subservient to him, blamed her for his own mistakes in filling out tax forms, refused to cooperate in correcting those mistakes, and referred to her as Mr. Melegari's "ass-licking partner." While these incidents, assuming they occurred, constitute unprofessional, inappropriate and in some cases inexcusable behavior, absent some adequate basis for inferring that they were in fact motivated by plaintiff's race, they do not suffice to create an issue of fact as to whether plaintiff was subjected to a race-based hostile work environment.

Plaintiff has not provided any basis to conclude that her mistreatment was race-based. The only non-neutral incident offered by plaintiff is defendant Gleeson's alleged 2001 comment to her that "one day we are going to come in and there's going to be a rope hanging from the ceiling and guess who is going to be

hanging from it."[13]  While clearly offensive, this isolated

comment is not the sort of extraordinarily severe or egregious

incident that may by itself transform workplace conditions into a

hostile work environment.  *C.f. Tomka v. Seiler Corp.*, 66 F.3d

1295, 1305 (2d Cir. 1995) ("even a single incident of sexual

assault sufficiently alters the conditions of the victim's

employment and clearly creates an abusive work environment" under

Title VII), *abrogation on other grounds recognized in Belfi v.

Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999).  Nor does the

comment by itself constitute an adequate basis from which to

infer that the facially race-neutral conduct of which plaintiff

complains was racially motivated.  While plaintiff argues that

defendants' racial animus can be inferred from their differential

treatment of her as opposed to Caucasian employees, Pl. Mem. In

Supp. at 46, plaintiff's argument is belied by the fact that

other African or African-American employees at MaxMara --

including Ms. Uyo, who reported directly to defendant Gleeson --

do not complain of differential treatment.  In addition,

elsewhere in her papers, plaintiff argues that Caucasian

---

[13] Reasoning that plaintiff's entire hostile work environment claim hinges upon this alleged 2001 comment, defendants assert that plaintiff's hostile work environment claims are time-barred.  Def.'s Mem. In. Supp. at 23 n.14, Def.'s Reply at 13-14.  Plaintiff contends that her claims are not time-barred because the 2001 comment was part of an ongoing policy of discrimination, acts of which occurred during the relevant statutes of limitation.  Pl.'s Mem. In Opp. at 44.  Because I conclude that plaintiff has not presented sufficient evidence of discrimination to support a hostile work environment claim, I need not consider this argument.

employees were also mistreated.

Considering the totality of the circumstances in the light most favorable to plaintiff as the non-moving party, I conclude that plaintiff has not presented evidence sufficient to raise an issue of fact as to whether she was subjected to a hostile work environment within the meaning of Title VII.  Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

C.   Retaliation

Retaliation in violation of Title VII occurs when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause . . . [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the [adverse action] exist." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).  A Title VII retaliation claim is analyzed according to the same three-step, burden-shifting framework applicable to Title VII discrimination claims.  Once a plaintiff establishes a *prima facie* case of retaliation, a defendant must offer a legitimate, non-retaliatory reason for its actions, but need not prove its actions were "rational, wise, or well-considered[;] only [that they were] non-discriminatory."  *Whaley v. City Univ. of New York,* No. 04-CV-7107, 2008 WL 2200230, at *20 (S.D.N.Y. 2008) (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1157 (2d

Cir.), *cert. denied*, 439 U.S. 984 (1978)). The plaintiff then bears the burden of proving either that the reason given is pretextual, or that retaliatory animus was nevertheless a "motivating factor" behind the adverse action, in which case she need not disprove the employer's proffered explanation. *Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities*, 115 F.3d 116, 119-20 (2d Cir. 1997). If the plaintiff is successful in proving that retaliatory animus was a motivating factor, the employer bears the burden of proving that it would have taken the same action for a permissible reason. *Id.*

To make out a *prima facie* case of retaliation, a plaintiff employee must demonstrate: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Hunter v. St. Francis Hosp.*, 281 F.Supp.2d 534, 546-47 (E.D.N.Y. 2003) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). A protected activity is any "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). In order to prove that she engaged in a protected activity, plaintiff need not show that conduct complained of was unlawful as long as the plaintiff had a "*good*

*faith, reasonable belief* that the underlying challenged actions
of the employer violated the law." *Quinn*, 159 F.3d at 769
(emphasis in original)(quoting *Manoharan v. Columbia Univ.
College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d. Cir.
1988)). The adverse employment action must be one that a
reasonable employee would have found materially adverse; *i.e.*, it
"might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." *Burlington N. & Sante Fe
Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation
marks and citation omitted).

Here, plaintiff argues that she participated in a protected
activity of which defendants were aware when she allegedly
complained to defendant Caroggio that employees of Italian origin
were receiving preferential treatment during her meeting with him
in May of 2005. She further argues that defendant MaxMara
engaged in a material adverse employment action by terminating
her employment.[14] Finally, plaintiff argues that a sufficient

_____

[14] Plaintiff also argues that defendants engaged in material adverse
employment actions when (1) they terminated Ms. Kzyck without consulting her
and without her knowledge, even though terminating employees is one of
plaintiff's key duties, and (2) defendant Caroggio allegedly accused her of
doing something illegal by processing out-of-plan claims for Mr. Melegari. In
order to demonstrate that an employer engaged in a material adverse employment
action supporting a retaliation claim, "a plaintiff must show that a
reasonable employee would have found the challenged action materially adverse,
which in this context means it well might have dissuaded a reasonable worker
from making or supporting a charge of discrimination." *Burlington*, 548 U.S.
at 68 (internal quotation marks and citations omitted). No reasonable fact-
finder could conclude that defendants' failure to consult plaintiff before
firing Ms. Kzyck, or defendant Caroggio's alleged accusation, would have
dissuaded a reasonable worker from making or supporting a charge of
discrimination. Accordingly, I conclude that these incidents do not, as a
matter of law, constitute material adverse employment actions. *See, e.g.*,

causal connection exists between the material adverse employment action and the protected activity, given that she was terminated approximately two months following her complaint. For the purposes of this motion, I will assume without deciding that plaintiff has adequately established a *prima facie* case of retaliation.

Defendants offer several reasons for terminating plaintiff which, they argue, were legitimate and non-discriminatory. Defendant Caroggio characterizes his decision to terminate plaintiff's employment as follows:

> My decision to terminate Ms. Fleming's employment was based on my view that there was a need to upgrade the position. The Director of Human Resources and Payroll plays an important and sensitive role in a growing, diverse company such as MaxMara, and there had been numerous instances where [plaintiff's] inappropriate, insensitive, or otherwise disproportionate conduct towards other employees had demonstrated to me that she lacked the judgment needed for the role, particularly the judgment necessary to handle sensitive communications with other MaxMara employees in a manner designed to defuse potential situations.

Caroggio Aff. ¶ 31. As examples of conduct prompting him to determine that plaintiff lacked the judgment necessary to fill her evolving role, defendant Caroggio refers to (1) plaintiff's email to Ms. Haddock, on which the entire firm was copied, in

---

*Gelin v. Geitner*, No. 06-CV-10176, 2009 WL 804144, at *20-21 (S.D.N.Y. Mar. 26, 2009) (noting that in the context of a retaliation claim, "to meet [the material adverse employment action] standard, a plaintiff must allege a significant rather than a trivial harm, which would be likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers," and collecting cases providing examples of incidents that do not qualify as material adverse employment actions under this standard) (internal quotation marks and citation omitted).

which plaintiff publicly rebuked Ms. Haddock for announcing an
employee promotion that plaintiff herself should have announced;
(2) plaintiff's convening of a firm-wide meeting to discuss an
employee suicide, without clearing its proposed content with
senior management, and during which plaintiff accused certain
MaxMara employees of being responsible for the suicide; (3)
"unprofessional, sarcastic, and demeaning" emails directed toward
MaxMara's head of retail; (4) other employees' alleged complaints
about plaintiff's "lack of professionalism and favoritism," and
(5) plaintiff's alleged failure to follow company protocol when
she transferred Ms. Yonzon from defendant Gleeson's department to
her own, and hired an individual to replace Ms. Yonzon, without
prior consultation with defendant Gleeson.  Caroggio Aff. ¶¶ 32-
38.  While plaintiff argues that her conduct was at no time
inappropriate, with the exception of the employees' alleged
complaints (for which she contends there is no evidence), she
does not dispute that the incidents referred to by defendant
Caroggio took place.  "An employer's decisions are given
deference by the court unless they are clearly pretextual."
*Warren v. N. Shore Univ. Hosp.*, No. CV-03-0019, 2006 WL 2844259,
at *8 (E.D.N.Y. Sept. 29, 2006).  "[I]t is not the function of a
fact-finder to second-guess business decisions."  *Fahmy v. Duane
Reade, Inc.*, No. 04-1798, 2006 WL 1582084, at *7 (S.D.N.Y. Jun.
9, 2006) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108,

1116 (2d Cir. 1988)). Accordingly, defendants have offered a legitimate, non-discriminatory reason for terminating plaintiff's employment.

In light of defendants' showing, the burden shifts back to plaintiff to establish either that defendants' proffered reasons are pretextual, or that retaliatory animus was nevertheless a motivating factor behind her termination. Plaintiff can show neither. First, there is no evidence that defendants' reason for terminating plaintiff's employment is pretextual. While plaintiff argues that her behavior during the incidents cited by defendants was appropriate and justified, a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact. *See Warren*, 2006 WL 2844259, at *8 ("An employee's subjective opinion about [her] own qualifications is insufficient to give rise to a triable issue of fact concerning whether the employer's proffered reason for its actions is a pretext for discrimination.") (citation omitted). Second, the only causal connection plaintiff identifies between her alleged engagement in a protected activity and her termination is temporal proximity, since she was terminated approximately two months after she complained to defendant Caroggio. While temporal proximity is sometimes enough to establish a *prima facie* case of retaliation, see *Harrison v.*

*N. Shore Univ. Hosp.*, No. 04-CV-2033, 2008 WL 656674, at *12
(E.D.N.Y. Mar. 6, 2008) (one to two months' temporal proximity
sufficient to support *prima facie* case), under the circumstances
present here, standing alone, it is insufficient evidence to
permit a reasonable fact-finder to conclude that retaliatory
animus was a factor motivating defendant MaxMara to terminate
plaintiff. *See, e.g.*, *Reilly v. Metro-North Commuter R.R. Co.*,
No. 93 Civ. 7317, 1996 WL 665620, at *14 (S.D.N.Y. Nov. 15, 1996)
(timing of events alone, even if sufficient to meet plaintiff's
*prima facie* burden of showing retaliation, could not defeat
defendant's summary judgment motion); *see also Brown v. Coughlin*,
965 F.Supp. 401, 406-07 (W.D.N.Y. 1997) (collecting cases).
Accordingly, summary judgment is granted in defendants' favor on
plaintiff's Title VII retaliation claim.

III. <u>Municipal (NYCHRL) Claims</u>

Although plaintiff has no federal claim that survives
summary judgment, her claims under the NYCHRL arise from the same
facts and rely on the same evidence as her federal claims, and as
a result, this Court retains discretion to exercise supplemental
jurisdiction over those claims. *See* 28 U.S.C. § 1367(a);
*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296,
308 (2d Cir. 2004) (noting that supplemental jurisdiction exists
where pendent claims share a "common nucleus of operative fact"
with federal claims) (internal quotation marks omitted).  Given

the substantial resources already expended by the parties in developing, and the Court in reviewing, the voluminous factual record and the numerous legal arguments in this case, the Court's exercise of supplemental jurisdiction over plaintiff's pendent claims is warranted.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (noting that when "the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair" (internal quotation marks omitted)).  Accordingly, I proceed to consider plaintiff's claims under city law.

Like Title VII, the NYCHRL prohibits employment discrimination based on an individual's race and national origin.[15]  Although employment discrimination claims under the NYCHRL are generally evaluated under the same framework as Title VII claims, *see McDowell v. T-Mobile USA, Inc.*, No. CV-04-2909 (DGT), 2007 WL 2816194, at *7 n.16 (E.D.N.Y. 2007), unlike Title

---

[15] Under the NYCHRL, it is unlawful for an

employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin, Code § 8-107(1)(a).

VII, the NYCHRL provides for individual liability,[16] *Feingold v.
New York,* 366 F.3d 138, 158-59 (2d Cir. 2004), and does not hold
an employer liable for an employee's discriminatory act "unless
the employer became a party to it by encouraging, condoning, or
approving it." *Heskin v. Insite Advertising, Inc.*, No. 03 Civ.
2598(GBD), 2005 WL 407646, at *23 (S.D.N.Y. Feb. 22, 2005)
(internal quotation marks and citations omitted) (collecting
cases). In addition, claims under the NYCHRL are not controlled
by Title VII analysis; rather, they require "require an
independent liberal construction analysis in all circumstances,
even where State and federal civil rights laws have comparable
language." *Williams v. N.Y. City Housing Auth.*, 872 N.Y.S.2d 27,
31 (1st Dep't 2009). While Title VII analysis and case law
provide a useful framework and persuasive authority for NYCHRL
claims, the Local Civil Rights Restoration Act of 2005 (the
"Restoration Act") makes clear that "similarly worded provisions
of federal and state civil rights laws [should be viewed] as a
floor below which the City's Human Rights law cannot fall, rather
than a ceiling above which the local law cannot rise." N.Y.C.
Local Law No. 85 of 2005, § 1 (Oct. 3, 2005). *See also Pugliese
v. Long Island R.R. Co.*, No. 01 CV 7174(NGG), 2006 WL 2689600, at

---

[16] The NYCHRL expressly provides that it shall be unlawful for an
"employer *or an employee* . . . to discriminate," *see supra* n.8 (emphasis
added). In addition, the NYCHRL provides for employee aiding or abetting
liability: "It shall be an unlawful discriminatory practice for any person to
aid, abet, incite, compel or coerce the doing of any of the acts forbidden
under this chapter, or to attempt to do so." N.Y.C. Admin. Code § 8-107(6).

*11 (E.D.N.Y. 2006); *accord*, *Selmanovic v. NYSE Group, Inc.*, No. 06 Civ. 3046, 2007 WL 4563431, at *3-4 (S.D.N.Y. Dec. 21, 2007).

A.  Race Discrimination

As under Title VII, the analysis of race discrimination claims under the NYCHRL proceeds according to the same three-step burden shifting framework established by the Supreme Court. *Hanna v. New York Hotel Trades Council*, 851 N.Y.S.2d 818, 822 (N.Y. Sup. Ct. 2007).  A *prima facie* case of race discrimination under the NYCHRL contains the same elements as those required under Title VII.  *Id.*  As described above, plaintiff has failed to make out a *prima facie* case of race discrimination because she cannot demonstrate that she was discharged under circumstances giving rise to an inference of discrimination.  Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's race discrimination claim under municipal law.

B.  Hostile Work Environment

As set forth *supra*, plaintiff's claim for race-based hostile work environment fails under the Title VII standard because plaintiff has not alleged sufficiently "severe or pervasive" discriminatory conduct.  Unlike Title VII, however, the NYCRL allows liability to attach for harassing conduct that does not qualify as "severe or pervasive."  In *Williams v. New York City Housing Authority*, the Appellate Division of the First Department of New York recently clarified that under the NYCHRL, "questions

of 'severity' and 'pervasiveness' are applicable to consideration
of the scope of permissible damages, but not to the question of
underlying liability." 872 N.Y.S.2d 27, 38 (1st Dep't 2009)
(citing *Farrugia v. North Shore Univ. Hosp.*, 820 N.Y.S.2d 718,
725 (N.Y. Sup. Ct. 2006)). Thus, the *Williams* court concluded
that "the primary issue for a trier of fact in harassment cases .
. . is whether the plaintiff has proven by a preponderance of the
evidence that she has been treated less well than other employees
because of her [race]," and therefore, summary judgement "should
normally be denied to a defendant if there exist triable issues
of fact as to whether such conduct occurred." *Id.* at 39.
Nevertheless, the court recognized that the NYCHRL is not a
"general civility code," and that it does not impose liability
for "petty slights and trivial inconveniences." *Id.* at 40-41.[17]

In this case, the only race-based harassing conduct alleged
by plaintiff is the racially charged remark defendant Gleeson
purportedly made to her in 2001. The NYCHRL affords a party
three years from the date of any allegedly discriminatory act to

---

[17] At oral argument, plaintiff also relied on a recent case decided in
the Southern District, *Zustovich v. Harvard Maintenance, Inc.*, for the
proposition that summary judgment should not be granted on her NYCHRL hostile
work environment claim. No. 08 Civ. 6856, 2009 WL 735062 (S.D.N.Y. Mar. 20,
2009). In *Zustovich*, Judge Baer determined on a motion to dismiss that "at
this early stage of litigation, dismissal of the City claim for hostile work
environment is inappropriate. Under the liberal pleading standard and
protective nature of the City Human Rights Law, Zustovich has adequately pled
the existence of unequal treatment to survive a motion to dismiss on this
ground." *Id.* at *12 (citing *Selmanovic*, 2007 WL 4563431 at *4). Because
extensive discovery has already occurred in this matter and the motion before
me is for summary judgment rather than dismissal, *Zustovich* is of limited
guidance here.

file suit.  N.Y. City Admin. Code § 8-502(d); *Milani v. Int'l*

*Bus. Machines Corp., Inc*., 322 F.Supp.2d 434, 451 (S.D.N.Y. 2004)

(noting that the NYCHRL is subject to a three-year statute of

limitations).  Because plaintiff filed suit in November 2006,

discriminatory conduct that occurred prior to November 2003 would

normally be time-barred unless the continuing violation doctrine

applies.  "[A] continuing violation may be found where there is

proof of specific ongoing discriminatory policies or practices,

or where specific and related instances of discrimination are

permitted by the employer to continue unremedied for so long as

to amount to a discriminatory policy or practice[.]"  *Clark v.*

*State*, 754 N.Y.S.2d 814, 817 (4th Dep't 2003).  Here, there is no

evidence that defendant Gleeson's racially charged remark was

related to any other instances of discrimination alleged by

plaintiff, and indeed, according to plaintiff's own testimony,

defendant Gleeson's superior promptly reprimanded him for making

the remark.  Therefore, defendant Gleeson's alleged race-based

remark is not brought within the limitations period by virtue of

the continuing violation doctrine.[18]

---

[18] Defendants further argue that defendant Gleeson's 2001 remark is
outside the purview of the NYCHRL, given that the remark was allegedly made in
New Jersey, not New York City.  *See Shah v. Wilco Systems, Inc.*, 806 N.Y.S.2d
553, 558 ("[A]pplicability of the NYCHRL is limited to acts occurring within
the boundaries of New York City.").  In light of my conclusion that the remark
is time-barred, I need not consider this argument.

As previously discussed, the instances of alleged discrimination occurring within the limitations period are facially race-neutral, and plaintiff has not established an adequate basis permitting a trier of fact to infer that the alleged discriminatory conduct was motivated by plaintiff's race. Accordingly, notwithstanding the NYCHRL's more lenient standard for hostile work environment claims, defendants' motion for summary judgment is granted with respect to plaintiff's NYCHRL hostile work environment claim.

C.  Retaliation

As under Title VII, NYCHRL retaliation claims are analyzed under the familiar three-step, burden-shifting framework, according to which plaintiff must first establish a *prima facie* case of retaliation.  "To establish a *prima facie* claim of retaliation under the New York City Human Rights Law, a plaintiff must demonstrate that '(1) [s]he participated in a protected activity known to the defendant; (2) the defendant took an employment action that disadvantaged the plaintiff; and (3) that a causal connection exist[s] between the protected activity and the adverse employment action.'"  *Selmanovic*, 2007 WL 4563431, at *5 (citing *Farrugia*, 820 N.Y.S.2d at 727).  Plaintiff argues that the standard for establishing that an employer engaged in an adverse employment action is less stringent under the NYCHRL than under Title VII, particularly in light of the Restoration Act.

*See, e.g.*, *Selmanovic*, 2007 WL 4563431, at *5 (discussing post-Restoration Act standard); *Farrugia*, 820 N.Y.S.2d at 727 (same). While this may be, plaintiff's retaliation claim fails in the Title VII context not because she has failed to show that defendants took an employment action that disadvantaged her, but because she cannot rebut defendants' legitimate, non-discriminatory reasons proffered for their actions through evidence that the reasons are pretextual, or that retaliatory animus was nevertheless a motivating factor. Accordingly, plaintiff's retaliation claim also fails under City law, and summary judgment is granted in defendants' favor with respect to this claim.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to each of plaintiff's claims. The Clerk is directed to enter judgment in defendants' favor, and to transmit a filed copy of the within to all parties and the magistrate judge.


SO ORDERED.

Dated :   Brooklyn, New York
          June 30, 2009


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge