UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

YVONNE FLEMING,

                              Plaintiff,          NOT FOR PUBLICATION

                                                  MEMORANDUM AND ORDER

        - against -
                                                  06-CV-6357 (CBA)(JMA)

MAXMARA USA, INC, JOHN GLEESON, and
LUIGI CAROGGIO,

                              Defendants.

-----------------------------------------------------------------X

AMON, District Judge.

        On November 29, 2006, plaintiff Yvonne Fleming commenced this action against

defendants MaxMara USA, Inc. ("MaxMara"), John Gleeson, and Luigi Caroggio, asserting

claims of (1) discrimination on account of her race, (2) race-based hostile work environment, and

(3) retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§

2000e *et seq.* ("Title VII") and the New York City Human Rights Law, New York City

Administrative Code §§ 8-107 *et seq.* ("NYCHRL").[1]  Presently before this Court is (1)

defendants' motion for attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k)[2] and Federal Rule of

---

[1] The Amended Complaint ("Am. Compl.") also asserted a claim arising under § 510 of the Employee
Retirement Income Security Program ("ERISA"), 29 U.S.C. § 1140; plaintiff withdrew that claim during briefing of
defendants' motion for summary judgment.

[2] 42 U.S.C. § 2000e-5(k) provides: "[i]n any action or proceeding under [Title VII of the Civil Rights Act
of 1964] the court, in its discretion, may allow the prevailing party. . . a reasonable attorney's fee (including expert
fees) as part of the costs."

Civil Procedure 54(d)[3]; and (2) plaintiff's request for leave to move for attorneys' fees incurred in opposing defendants' instant motion. For the reasons that follow, defendants' motion is denied and plaintiff's request for leave is denied.

## BACKGROUND

Familiarity with Judge Sifton's earlier decisions is assumed. *See Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247 (E.D.N.Y. 2009). The following facts are drawn from the parties' submissions in connection with this motion and the record of proceedings before Judge Sifton.[4]

Plaintiff is an African-American woman and the former Director of Human Resources and Payroll for defendant MaxMara, a wholly owned United States subsidiary of MaxMara Fashion Group S.r.L., which in turn is a privately owned women's apparel company based in Italy. MaxMara Fashion Group S.r.L. employs approximately 300 people in the United States. Defendant Gleeson is the former Vice President of Finance for defendant MaxMara. Defendant Caroggio held the position of Vice President of Operations at MaxMara from May 2003 until January 2008, when he assumed the role of Chief Executive Officer.

On December 4, 2000, Guglielmo Melegari, then-President of MaxMara, hired plaintiff on an "at-will" basis to serve as MaxMara's Director of Human Resources and Payroll, a newly

---

[3] Fed. R. Civ. Pro. 54(d)(1)(b) provides that "costs--other than attorney's fees--should be allowed to the prevailing party," and permits a party to seek fees by submitting a motion specifying, *inter alia*, the statute, rule, or other grounds entitling the moving party to the award of fees, and the amount or a fair estimate of the amount sought.

[4] This matter was originally assigned to the late Judge Charles P. Sifton. It was transferred to the undersigned on December 1, 2009. Citations to affidavits ("Aff.") refer to those affidavits submitted in connection with defendants' motion for summary judgment, with the exception of the affidavit of Hollis Gonerka Bart ("Bart Aff."), which was submitted in support of defendants' present motion for attorneys' fees.

created position. At that time, plaintiff did not (and does not currently) possess a college degree, but had 13 years of experience working in payroll and human resources in the retail industry. At MaxMara, plaintiff reported both to Mr. Melegari and defendant Gleeson, then-Vice President of Finance for MaxMara.

On February 1, 2001, plaintiff met with Sandy Ost, then-Assistant Treasurer of MaxMara, in Ms. Ost's office, with Defendant Gleeson also present. According to plaintiff, the purpose of the meeting was to discuss a change plaintiff wished to make to the payroll system. Plaintiff testified that during the meeting, defendant Gleeson, allegedly because he was "upset about all the changes [plaintiff] was making throughout the company," made the following statement: "one day we are going to come in and there's going to be a rope hanging from the ceiling and guess who is going to be hanging from it." Plaintiff's Deposition ("Pl. Dep.") at 103:5-18. Plaintiff testified that defendant Gleeson and Ms. Ost burst out laughing following the statement. Defendant Gleeson denies ever making the statement or any other racially charged remarks to plaintiff. Gleeson Aff. ¶ 23.[5] According to plaintiff, Mr. Melegari, plaintiff, and defendant Gleeson met the following day to discuss the incident, at which time Mr. Melegari reprimanded defendant Gleeson. Mr. Melegari did not recall a meeting relating to defendant Gleeson's alleged remark, but testified that he remembered "having at least a meeting with [plaintiff] and [defendant Gleeson] at the beginning [of plaintiff's tenure at MaxMara] relating to the problems

---

[5] In her Local Rule 56.1 Statement in opposition to defendants' motion for summary judgment, plaintiff cited a submission made by defendant MaxMara to the New York State Division of Human Rights, which included Ms. Ost's recollection that defendant Gleeson made a comment about a rope. Affidavit of Denise K. Bonnaig ("Bonnaig Aff."), Ex. 23 at 5 (copy of MaxMara's submission). The submission states that according to Ms. Ost, the comment was not directed toward plaintiff, nor was it racial in character. *Id.* Because neither party submitted an affidavit by Ms. Ost in connection with defendants' motion for summary judgment, Judge Sifton deemed Ms. Ost's comments to be hearsay and did not rely on them in concluding that defendants were entitled to summary judgment.

that came from creating this new position." Melegari Dep. at 27:2-7.

According to plaintiff, defendant Gleeson targeted plaintiff and her subordinates, two of whom were also African American, for poor treatment during plaintiff's tenure at MaxMara. For example, plaintiff alleged that defendant Gleeson excluded her from meetings she should have attended or conducted in her official capacity, excessively criticized her work on MaxMara's Employee Manual, and sent rude emails to her. In her Amended Complaint, plaintiff alleged that defendant Gleeson refused to answer work-related questions, arbitrarily imposed Finance Department duties on her, and insulted her in front of the whole office by stating he was "washing his hands off" of her. Am. Compl. ¶ 21. Plaintiff also testified that defendant Gleeson yelled at plaintiff's staff and threw books at them. Defendant Gleeson denied that any of his interactions with plaintiff were disrespectful in nature or in any way connected to her race.

It is undisputed that in 1996, defendant Gleeson hired Katie Uyo, a native African woman, to assume a position reporting to him in the Finance Department of MaxMara. Ms. Uyo worked for MaxMara throughout plaintiff's tenure there. Plaintiff stated that at some point in time, Ms. Uyo told her "to be submissive to Defendant Gleeson and 'yes yes yes him to death.'" Plaintiff's ("Pl.") Aff. ¶ 6. Ms. Uyo denied ever having told plaintiff that non-Caucasian employees were expected to play a submissive role with defendant Gleeson, or that they were expected to "yes him" all the time. Uyo Aff. ¶ 21.

According to defendants Caroggio and Gleeson, during an incident shortly before January 2004, plaintiff failed to follow company protocol regarding internal employee transfers. At that time, plaintiff decided to transfer Luisa Yonzon, an Accountant Clerk who reported directly to defendant Gleeson, to plaintiff's own department, and to hire another individual, Ma Lorraine De

La Rosa Ramos, to replace Ms. Yonzon in Accounting. According to defendants Gleeson and Caroggio, MaxMara's practice regarding internal transfers was that the heads of the incoming and outgoing departments were required to sign off on transfers before they were approved. Likewise, MaxMara required that all department heads pre-approve new hires coming into their departments. Defendants Gleeson and Caroggio stated that plaintiff failed to secure defendant Gleeson's approval or even his knowledge prior to the transfer of Ms. Yonzon and the hire of Ms. Ramos.

Plaintiff conceded that she effected the transfer and the new hire, but denied that she breached company protocol. Plaintiff testified that prior to transferring Ms. Yonzon, she spoke with both defendants Gleeson and Caroggio, along with other MaxMara employees including former President Melegari, and that "everybody blessed" the transfer. Mr. Melegari signed a form dated February 5, 2004 approving the transfer, Bonnaig Aff. Ex. 8 (copy of form), but recalled at his deposition that although he "agreed in principle with the move, [he] believe[d] [he] was presented after the fact with everything that was done and [he] was not pleased with the process, not the final outcome or final result." Deposition of Guglielmo Melegari ("Melegari Dep.") at 75:11-16. Defendant Gleeson denied that plaintiff secured his prior approval.

Defendant Caroggio stated that when Mr. Melegari learned about the transfer incident involving plaintiff and Ms. Yonzon, he "berated [defendant Caroggio] for allowing [plaintiff] to breach Company protocol." Caroggio Aff. ¶ 39. In response, in January 2004, defendant Caroggio drafted and sent an email to Mr. Melegari in Italian. According to plaintiff's translation, the email included the following statement:

On the other question, Yvonne (Director of HR!!!!!!!!) contacted Luisa

- 5 -

without anyone's authorization and I, when I heard about it, did not want
to dispute it because
a) I thought you had approved it,
b) The substitution did not generate additional costs to the departments for
which I am responsible
c) I don't want to obstruct the enthusiasm demonstrated by Luisa towards
the new opportunity.
Now I have the duty of calling you every time Yvonne goes to shit!!
Instead of breaking my balls teach good manners and proper behavior to
your ass-licking partners.

Bonnaig Aff. Ex. 24 (copy of English translation of email).

According to plaintiff, in addition to referring to plaintiff as an "ass-licking partner" in

the January 2004 email, defendant Caroggio also generally treated her as if she were subservient

to him. Pl. Dep. at 194:14-197:6. For instance, she testified that he at times ordered her to

perform tasks not within her job description. *Id.* In addition, she alleged that when she

attempted, at defendant Gleeson's direction, to correct errors in defendant Caroggio's

employment paperwork relating to social security taxes, defendant Caroggio became enraged,

blamed her for creating problems, and refused to cooperate in rectifying the tax issue until Mr.

Melegari intervened. Am. Compl. ¶¶ 50-56.

In August of 2004, one of MaxMara's employees committed suicide. Caroggio Aff. ¶ 34.

In response, plaintiff called a firm-wide meeting to discuss the incident. *Id.* According to

plaintiff, Mr. Melegari instructed her to convene a meeting in order to explain what had

happened. Pl. Dep. at 81:23-82:11. Defendants Caroggio and Gleeson stated, however, that

plaintiff did not clear the meeting's content with senior management beforehand, and that at the

meeting, plaintiff "went so far as to attribute the employee's suicide to alleged mistreatment the

employee had received from specific co-workers," adding, "and you know who you are."

Gleeson Aff. ¶ 7; Caroggio Aff. ¶ 34. Plaintiff denied having made any comment that could be interpreted as accusing specific employees of mistreatment that may have contributed to the suicide. Pl. Dep. at 82:24-83:10.

In January of 2005, Emmi Haddock, MaxMara's Director of Sales, circulated a firm-wide email announcing a promotion of one of her subordinates, in contravention of company policy directing that such announcements should be made by plaintiff. In response, plaintiff sent a firm-wide email that stated the following:

> Emmi:
> I am sure that your employee is grateful to your company wide email announcement that you have sent out today. However, I need to remind you that it isn't your responsibility to do so. I sent out a memo . . . apprising you that any announcements in new hires are done via my office. . . . What I fail to understand is, either your lack of regard for procedures or that you didn't comprehend the memo.
>> I therefore recommend, that in the future, should you be confused as to the purpose, content, meaning, request, etc., etc. of any memos or emails generated from my office, do feel free to call my office and I shall have the pleasure of simplifying it for you.

Caroggio Aff. Ex. 12 (copy of email).

At his deposition, defendant Caroggio testified that he complained to Mr. Melegari about plaintiff's handling of the 2004 employee suicide incident and plaintiff's 2005 public email exchange with Ms. Haddock. Deposition of Luigi Caroggio ("Caroggio Dep.") at 130:7-158:21. He also testified that during plaintiff's tenure at MaxMara, at executive meetings attended by himself, Mr. Melegari, defendant Gleeson, and others, complaints were voiced concerning plaintiff's job performance.

Also in January of 2005, plaintiff received an oral performance review from Mr. Melegari for the year 2004, following which Mr. Melegari recommended only a small raise for plaintiff.

Caroggio Aff. ¶ 25. In response, plaintiff submitted a memorandum dated January 21, 2005 to Mr. Melegari in order "to set the record straight" and to submit "rebuttals" concerning the issues Mr. Melegari raised during the review. *Id.* Ex. 10 (copy of memorandum). Among other things, plaintiff discussed the employee suicide incident, her communication skills, and her view that her performance had been negatively affected by her exclusion from meetings where she should have been present. Plaintiff did not discuss or allege any discrimination in the memorandum. At her deposition, however, plaintiff testified that she had at other times complained orally to Mr. Melegari about defendant Gleeson's alleged discrimination against her, but that the complaints were not reduced to writing because Mr. Melegari said he would "take care of it." Pl. Dep. at 234:1-235:13.

In April of 2005, Mr. Melegari either resigned or was forced out of his position as President of MaxMara, and in May of 2005, defendant Caroggio assumed the position of acting President of MaxMara. One of defendant Caroggio's first acts upon assuming his new position was to hold individual meetings with senior executives, including plaintiff, to discuss their concerns about the direction or future of MaxMara.

In preparation for her meeting with defendant Caroggio, plaintiff prepared a one-page memorandum dated May 11, 2005. *Id.* Ex. 11 (copy of memorandum). Plaintiff's memorandum included five points, the first of which stated: "Concerned about the direction/future of the Company[,]" and the remainder of which discussed issues relating solely to plaintiff's duties and benefits as Director of Human Resources and Payroll. Plaintiff testified that at her meeting with defendant Caroggio, while discussing the first point on the "direction/future of the Company[,]" she complained that Italian employees were receiving preferential treatment over American

- 8 -

employees. Pl. Dep. at 213:10-16. According to plaintiff, following Mr. Melegari's departure, at least nine individual employees orally complained to her about preferential treatment of Italians over Americans at MaxMara.[6] *Id.* at 214:17-216:3. Plaintiff testified that she relayed these complaints to defendant Caroggio at their meeting in May 2005, and that defendant Caroggio wrote them down. *Id.* at 225:18-226:21. Defendant Caroggio testified that he has no recollection of plaintiff having voiced such complaints to him during the meeting, Caroggio Dep. at 164:15-166:7, but stated that he "was aware that there was somebody saying, within the organization, that they felt the Italians were being given preferred treatment." *Id.* at 167:10-12.

In June of 2005, defendant Caroggio decided to terminate plaintiff's employment. Caroggio Aff. ¶ 29. In deposition testimony, Defendant Caroggio stated that his decision was based on his view that there was a need to upgrade plaintiff's position, as well as his perception that plaintiff's "inappropriate, insensitive, or otherwise disproportionate conduct towards other employees had demonstrated to [him] that she lacked the judgment needed for the role." *Id.* ¶ 31. Defendant Caroggio further stated that his decision to terminate plaintiff's employment had nothing to do with her race. *Id.* ¶ 30. According to Peri Bandazian, a former MaxMara employee, following Mr. Melegari's departure, defendant Caroggio terminated two American employees in leadership positions (one of whom was plaintiff) and "was going to bring over anybody and everybody from Italy and that was it." Deposition of Peri Bandazian ("Bandazian Dep.") at 59:3-60:13; 100:7-102:17.

---

[6] The only sworn statement submitted by plaintiff in support of this assertion was that of Marcia Smith, who was a MaxMara employee at the time of Mr. Melegari's departure. At her deposition, Ms. Smith testified that she complained to plaintiff that she thought she was paid less than other employees because of her ethnicity and gender, and possibly because she was not Italian. Deposition of Marcia Smith ("Smith Dep.") at 55:7-57:6.

- 9 -

At about the same time, defendant Caroggio terminated a company executive, Adriana Kyzyk, without consulting or informing plaintiff, although terminating employees was typically one of plaintiff's key duties. Caroggio Dep. at 187:21-92:6.[7] In addition, plaintiff testified that on June 23, 2005, defendant Caroggio accused her of having engaged in illegal behavior by processing an out-of-plan medical claim on behalf of Mr. Melegari. Pl. Dep. at 334:15-338:18. According to plaintiff, however, processing out-of-plan claims on behalf of the president of MaxMara was a common practice, and the claim related back to 2004, when Mr. Melegari was president. *Id.* at 336:10-12; 338:18-339:23. Plaintiff also testified that defendant Gleeson had previously processed out-of-plan claims for Mr. Melegari.

Following defendant Caroggio's decision to terminate plaintiff, defendant Caroggio asked defendant Gleeson to find a replacement for plaintiff's position. Caroggio Aff. ¶ 29. According to defendant Gleeson, an employment placement firm provided him with the resume of Lisa Derrick as a potential replacement candidate. After reviewing Ms. Derrick's resume, defendant Gleeson set up an interview with her. At this time, defendant Gleeson was, by his own account, unaware that Ms. Derrick was African-American. Defendant Gleeson testified that among the criteria influencing his decision to interview (and later hire) Ms. Derrick were (1) her college degree in Human Resources Management; (2) her 13 years of experience in human resources; and (3) her promotion over time by her previous employer from Human Resource Specialist to Vice President.

---

[7] At his deposition, defendant Caroggio reportedly testified that upon the advice of counsel, plaintiff was not authorized to terminate Ms. Kyzyk. This portion of defendant Caroggio's deposition testimony was not made available to the court, but was cited in plaintiff's memorandum of law in opposition to defendants' motion for summary judgment.

On Friday, July 15, 2005, defendant Caroggio informed plaintiff that her employment at MaxMara was being terminated. Defendant Gleeson attended the termination meeting, but according to both individual defendants, he was not involved in the decision to terminate plaintiff. Plaintiff alleges that defendant Gleeson was involved in the decision to terminate her, as shown by his participation in the termination meeting, his signature on her termination form, and the fact that he watched her "like a hawk" as she packed up her belongings. Bonnaig Aff. Ex. 3 (Affidavit of Marcia Smith) ¶ 14. According to Marcia Smith, an African-American woman formerly employed at MaxMara, when plaintiff was fired, she went to plaintiff's office, and defendant Gleeson told Ms. Smith "to make sure everything [plaintiff] takes is hers and not the company's." *Id.* Ms. Smith also stated that defendant Caroggio told her that plaintiff had been offered ten weeks of severance pay and that if plaintiff "fought this, she'd be sorry." *Id.*

On Monday, July 18, 2005, Lisa Derrick was hired as the new Director of Human Resources and Payroll for MaxMara, a position she retains today. Caroggio Aff. ¶ 44. Both defendant Caroggio and defendant Gleeson participated in the determination to hire Ms. Derrick. *Id.* ¶ 46; Gleeson Aff. ¶¶ 28, 34.[8]

On December 6, 2005, plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("SDHR"). On July 17, 2006, plaintiff's SDHR complaint was dismissed for "administrative convenience" due to plaintiff's stated intention to file a complaint in federal court.

---

[8] In her brief in opposition to defendants' motion for summary judgment, plaintiff alleged that defendant Gleeson said, in substance, that Ms. Derrick's employment would be terminated upon the conclusion of this lawsuit. The basis for the statement was a hearsay statement allegedly made to an individual named Nessy Rivera, who did not submit an affidavit. Judge Sifton found the statement inadmissible for summary judgment purposes.

On November 29, 2006, plaintiff commenced this action. After defendants moved for summary judgment on April 11, 2007, plaintiff requested discovery, and on May 21, 2007, Magistrate Judge Azrack granted plaintiff's request. Defendants withdrew their first summary judgment motion without prejudice on June 7, 2007. Following discovery between the parties, on January 23, 2009, defendants filed the motion for summary judgment. On June 30, 2009, Judge Sifton granted defendants' motion for summary judgment, concluding that (1) plaintiff had failed to establish a prima facie case of race discrimination because, *inter alia*, she was replaced by an employee of the same race and gender; (2) plaintiff had failed to establish a claim for hostile work environment because the vast majority of the incidents alleged were race-neutral and no incident was sufficiently severe to create a hostile work environment; and (3) plaintiff's claim of retaliation failed because plaintiff could not rebut defendants' proffered legitimate, nondiscriminatory reasons for terminating plaintiff by showing those reasons to be pretextual.

Defendants filed the present motion for attorneys' fees on July 14, 2009. On July 24, 2009, plaintiff appealed to the Second Circuit the Order granting summary judgment to defendants. By Summary Order dated March 25, 2010, the Second Circuit affirmed the judgment of the district court.

## DISCUSSION

### I.    Standard Governing a Motion for Attorneys' Fees and Costs

In a case under Title VII of the Civil Rights Act of 1964 ("the Act"), attorneys' fees are available "to the prevailing party" under Section 706(k) of Title VII of the Act, 42 U.S.C. § 2000e-5(k). Because of the differing purposes served by an award to a prevailing plaintiff versus

a prevailing defendant, courts apply a different standard depending on the party making an application for fees. The award of attorneys' fees to a successful plaintiff serves to vindicate the purposes of Title VII; accordingly there exists "a presumption that successful civil rights [plaintiffs] should ordinarily recover attorneys' fees unless special circumstances would render an award unjust." *Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001) (citing *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir. 1982)).[9] In contrast, fees "are not so readily available to a prevailing defendant." *La Grande v. Decrescente Distrib. Co.*, No. 1:06-CV-467 (FJS/DRH), 2009 WL 890584, at *4 (N.D.N.Y. Mar. 30, 2009) (citation omitted).

As the Supreme Court held in *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*:

> [A] moment's reflection reveals that there are at least two strong equitable considerations counseling an attorney's fee award to a prevailing Title VII plaintiff that are wholly absent in the case of a prevailing Title VII defendant. First . . . the plaintiff is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority. Second, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law.

434 U.S. 412, 418, 98 S. Ct. 694 (1978) (citation omitted). Fee awards to successful defendants are made available not in order to advance the purposes of Title VII, but rather to serve "as a deterrent to litigants who bring, or are contemplating bringing, frivolous lawsuits. . . [and] shield[] defendants from having to endure the burden and cost of defending against such frivolous litigation." *La Grande*, 2009 WL 890584, at *5. "[A]ssessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering

---

[9] Because 42 U.S.C. § 2000e-5(k) and 42 U.S.C.A. § 1988(b) have been interpreted to impose an identical burden on prevailing defendants seeking attorneys' fees, I refer to cases decided under § 1988 and § 2000e interchangeably *infra*. *See Lyte v. Sara Lee Corp.*, 950 F.2d 101, 103 (2d Cir. 1991) ("[O]pinions regarding fees in cases decided under [Section 1988] therefore are authoritative in the Title VII context.") (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983)).

in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII." *Christiansburg*, 434 U.S. at 422. *See also McCampbell v. Chrysler Corp.*, 425 F. Supp. 1326, 1327 (D. Mich. 1977) (Routine grants of attorneys' fees to prevailing defendants risk stifling "advocacy into uncharted waters.").

Accordingly, while a prevailing defendant need not show that the action was brought in bad faith, "fees should be awarded to prevailing defendants only when the plaintiff's 'claim was frivolous, unreasonable, or groundless, or. . . the plaintiff continued to litigate after it clearly became so.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (citing *Christiansburg*, 434 U.S. at 422).[10] *See also Hensley*, 461 U.S. at 429 n.2 ("a prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant.") (citing H.R. Rep. No. 94-1558, p. 7 (1976)). Courts in this circuit and elsewhere have described the relevant test as requiring consideration of "whether the claim itself is *clearly meritless*." *See, e.g., Davidson v. Keenan*, 740 F.2d 129, 133 (2d Cir. 1984) (emphasis added). *See also* 45C Am. Jur. 2d *Job Discrimination* § 2703 ("The test for [an] attorney fee award to a defendant under either Act is whether the claim itself is clearly meritless.") (citing *Tang v. State of R.I., Dept. of Elderly Affairs*, 163 F.3d 7, 14 (1st Cir. 1998)).

The Supreme Court has cautioned that in considering whether to award fees to a

---

[10] The parties each devote significant space to alleging that their adversary increased the cost of the litigation through delay, obstructionism and duplicative and excessive motion practice. While such tactics would undoubtably be relevant to consideration of the amount of any fee award, I do not find it to be relevant to whether a fee award is warranted in the first instance. Defendants allege that consideration of such unnecessary and harassing litigation tactics is "well established," but cite in support only a single case from the Western District of New York: *Murphy v. Bd. of Ed.*, 420 F. Supp. 2d 131 (W.D.N.Y. 2006). *Murphy* considered plaintiff's reprehensible conduct in determining whether an award of fees was equitable, after having already determined that plaintiff's claims were frivolous; plaintiff's cite no support for the proposition that a court may consider allegedly excessive discovery practices in determining whether a suit is frivolous. Further, Congress has provided other provisions through which a party may seek redress where an adversary "multiplies the proceedings in any case unreasonably and vexatiously." *See* 28 U.S.C. § 1927. Defendants have not sought fees under § 1927.

prevailing defendant, courts must be cognizant of the fact that a plaintiff's entitlement to legal

relief, and ability to prove the same, is often difficult to predict:

> [I]t is important that a district court resist the understandable temptation to engage
> in post hoc reasoning by concluding that, because a plaintiff did not ultimately
> prevail, his action must have been unreasonable or without foundation. This kind
> of hindsight logic could discourage all but the most airtight claims, for seldom can
> a prospective plaintiff be sure of ultimate success. No matter how honest one's
> belief that he has been the victim of discrimination, no matter how meritorious
> one's claim may appear at the outset, the course of litigation is rarely predictable.
> Decisive facts may not emerge until discovery or trial. The law may change or
> clarify in the midst of litigation. Even when the law or the facts appear
> questionable or unfavorable at the outset, a party may have an entirely reasonable
> ground for bringing suit.

*Christiansburg*, 434 U.S. at 421-22.[11] *See also Franchitti v. Bloomberg*, 411 F. Supp. 2d 466,

468 (S.D.N.Y. 2006) (courts "must be extremely cautious . . . to avoid chilling the vital ability of

persons who believe that they are victims of discrimination to seek recourse. They must remain

acutely aware that claims of discrimination in the workplace often can be difficult to prove, even

where discrimination actually has occurred, and that an award of attorneys' fees to a prevailing

defendant in such a case usually will not be warranted.").

Accordingly, defendants' burden of establishing that a claim was "frivolous,

unreasonable, or groundless" or "clearly meritless" is a heavy one, and "it is very rare that

victorious defendants in civil rights cases will recover attorneys' fees." *Sista v. CDC Ixis N. Am.,
Inc.*, 445 F.3d 161, 178 (2d Cir. 2004); *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir.

1986) (fee award to civil rights defendant is an "extreme sanction" reserved only for "truly

egregious cases of misconduct"); *Panetta v. Crowley*, 460 F.3d 388, 399 (2d Cir. 2006)

---

[11] Samuel Butler made a similar point more succinctly, noting, "In law, nothing is certain but the expense." *Quoted in* W.T. Tredway, *Suggestions and Reflections on the Study and Practice of Law and its Administration*, 57 Pittsburgh Legal Journal 190 (1910).

("[plaintiff's] conspiracy claim, though perhaps very thin, was not frivolous").

## II.    Plaintiff's Claims

Plaintiff alleged that defendant violated Title VII of the Civil Rights Act of 1964 by (1) discriminating against plaintiff on account of her race; (2) subjecting plaintiff to a race-based hostile work environment; and (3) retaliating against plaintiff following complaints of discrimination. She also asserted similar claims under the NYCHRL.

### A. Title VII and NYCHRL Discrimination Claim

To make out a *prima facie* case of discrimination under either Title VII or the NYCHRL, the plaintiff bears the burden of introducing evidence that would, if credited, establish: "1) that [s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). In Judge Sifton's June 30, 2009 Memorandum Opinion and Order, he found that plaintiff was contemporaneously replaced by an African American female, an individual of the same protected class, and consequently plaintiff had failed to make out a *prima facie* case of discrimination because she could not demonstrate that she was discharged "under circumstances giving rise to an inference of discrimination."

At issue is whether the contemporaneous hiring of a replacement of the same protected class rendered plaintiff's discrimination claim "frivolous, unreasonable, or groundless." Ordinarily, "absent other facts from which inferences may be drawn, unless a Title VII plaintiff is replaced by a member of a nonprotected class, proof of intentional discrimination [is] extremely

- 16 -

difficult, if not practically impossible." *Estepa v. Shad*, 652 F. Supp. 567, 571 n.5 (E.D.N.Y.

1987). *See also Spiegler v. Israel Discount Bank of New York*, No. 01 Civ. 6364 (WK), 2003

WL 21488040, at *11 (S.D.N.Y. June 25, 2003) ("Where no evidence giving rise to an inference

of discrimination has been presented, the fact that a plaintiff is replaced with an individual within

his protected class undermines his attempt to establish a prima facie case of discrimination."),

*rec'n denied*, 2003 WL 21983018 (S.D.N.Y. August 19, 2003). The parties do not dispute that

plaintiff was aware prior to filing the instant suit that she was replaced by a member of her

protected class. Accordingly it was clear from the outset of this litigation that plaintiff's

discrimination claim could succeed as a matter of law only if she had basis for the belief that

there existed "other facts from which the inference" of discrimination could be drawn. In

opposing defendants' motion for summary judgment, plaintiff contended that her replacement

was hired merely as a pretextual device designed to disguise defendants' discriminatory intent in

terminating her. However, Judge Sifton concluded that plaintiff had no evidence to support such

an hypothesis, and that the fact that a replacement from the same protected class was hired *before*

plaintiff filed or even threatened the instant suit rebutted a claim that defendants' actions were

merely an effort to disguise the discriminatory reasons for plaintiff's termination.[12] In particular,

plaintiff relied on: (1) a hearsay statement made by defendant Gleeson to the effect that Ms.

Derrick's employment would be terminated upon the conclusion of the instant lawsuit[13];

---

[12] According to defendants, Ms. Derrick continues to be employed at MaxMara. Bart Aff. ¶ 12.

[13] In considering defendants' motion for summary judgment, Judge Sifton excluded on hearsay grounds the alleged statement by defendant Gleeson that Ms. Derrick's employment would be terminated upon the conclusion of this lawsuit. *See supra* n.8. Plaintiff's renewed arguments in the present opposition to defendants' motion for attorneys' fees that the statement was admissible as to defendant Gleeson's state of mind is without merit; the statement is relevant if at all for the truth of the matter it asserts. However, even if the statement had been admissible, it fails to raise an inference of discrimination because Ms. Derrick was hired *before* plaintiff had

- 17 -

(2) allegations that Ms Derrick was hired through a non-standard hiring process[14]; and (3) claims that Ms. Derrick's performance was poor. As Judge Sifton found in his June 30, 2009 order, these contentions, even if true, do not support the inference that Ms. Derrick's hiring was merely a pretextual device in light of the fact that Ms. Derrick was hired prior to plaintiff's termination or initiation of the present suit. Accordingly, plaintiff's discrimination claim was clearly meritless from its inception.[15]

### B. Title VII Hostile Work Environment Claim

To make out a successful hostile work environment claim under Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Isolated incidents of offensive conduct are generally inadequate to establish a hostile work environment claim; plaintiff must show "either a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted" to cause a change in the work environment. *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted). Facially neutral incidents may be sufficient to establish a hostile work

---

threatened or initiated the current lawsuit.

[14] Plaintiff contends, *inter alia*, that although defendant Gleeson stated he may have used the employment placement firm "Right Management" or another staffing agency recommended by a Ms. Fran Prebish to assist in the search for plaintiff's replacement, discovery did not support defendants' contention. As stated in Judge Sifton's June 30, 2009 opinion, this dispute has limited relevance to the question of whether Ms. Derrick's hiring was pretextual.

[15] Plaintiff contends that Judge Sifton suggested plaintiff's claims were not frivolous by inquiring of defense counsel whether they had discussed the right to separate representation with their clients. *See Dunton v. County of Suffolk*, 729 F.2d 903 (2d Cir. 1984). Contrary to plaintiff's contentions, Judge Sifton's effort to ensure counsel comply with their ethical obligations by informing their clients of any potential conflicts of interest has no bearing on the court's evaluation of the merits of the underlying suit.

environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

In Judge Sifton's June 30, 2009 Memorandum Opinion and Order, he concluded that plaintiff's hostile work environment claim failed because: (1) the great majority of plaintiff's allegations in support of her hostile work environment claim were facially race-neutral[16]; and (2) the only non-neutral incident, in which defendant Gleeson's allegedly stated to plaintiff, "one day we are going to come in and there's going to be a rope hanging from the ceiling and guess who is going to be hanging from it," while clearly offensive, was an isolated comment not sufficiently severe or egregious to itself transform workplace conditions into a hostile work environment.

Whether a hostile work environment exists "must be determined from the totality of the circumstances on a case by case basis," *Kasper v. City of Middletown*, 352 F. Supp. 2d 216, 230 (D. Conn. 2005) (citation omitted); "the behavior which would rise to the level of an actionable 'hostile environment' cannot be precisely defined." *Christoforou v. Ryder Truck Rental, Inc.*, 668 F. Supp. 294 (S.D.N.Y. 1987) (citing *Neville v. Taft Broad. Co.*, No. CIV-82-622C, 42 Fair Empl. Prac. Cas. (BNA), 13141987 WL 9638 (W.D.N.Y. Jan. 16, 1987)). Accordingly, a prevailing defendant has a particularly heavy burden to establish that a plaintiff's hostile work

---

[16] For instance, plaintiff complained that defendant Gleeson excluded her from meetings she should have attended or conducted in her official capacity, excessively criticized her work, sent rude emails to her, refused to answer work-related questions, arbitrarily handed off duties to her, publicly insulted her by stating he was "washing his hands off" of her, and yelled and threw books at plaintiff's staff, who were African American. Plaintiff further claimed that defendant Caroggio treated plaintiff as if she were subservient to him, blamed her for his own mistakes in filling out tax forms, refused to cooperate in correcting those mistakes, and referred to her as Mr. Melegari's "ass-licking partner."

environment claim was *clearly* meritless. *See id.* at 301, 304 (finding plaintiff had not met her burden of demonstrating a hostile work environment because incidents "appear to have been quite sporadic and relatively innocuous," but denying fees to prevailing defendant). Although under the totality of the circumstances plaintiff could not meet her burden of demonstrating the pattern of discriminatory behavior was continuous or pervasive enough to create a hostile work environment, plaintiff's claims were not so frivolous as to warrant imposition of attorneys fees under § 2000e. Plaintiff alleged a series of incidents which, if believed, constituted "unprofessional, inappropriate and in some cases inexcusable behavior." *See Fleming*, 644 F. Supp. 2d at 263. At least one of those incidents, the alleged comment concerning a rope, could reasonably have been interpreted as having racial overtones. Accordingly, although plaintiff failed to raise an issue of material fact concerning whether a discriminatory motive could be attributed to the bulk of defendants' comments, plaintiff had a legitimate and non-frivolous basis for alleging that defendant created a hostile work environment in violation of Title VII.

### C. NYCHRL Hostile Work Environment Claim

"The New York City Human Rights Law was intended to be more protective than the state and federal counterpart." *Farrugia v. N. Shore Univ. Hosp.*, 13 Misc. 3d 740, 748, 820 N.Y.S.2d 718, 724 (Sup. Ct. 2006). Unlike Title VII, the NYCHRL imposes liability for harassing conduct that does not qualify as "severe or pervasive," and "questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st Dep't 2009) (citing *Farrugia*, 820 N.Y.S.2d at 725). Despite the more permissive

standard of the NYCHRL, Judge Sifton granted summary judgment in favor of defendants, concluding that: (1) the alleged "rope" comment by defendant Gleeson was barred by the three year statute of limitations of the NYCHRL; and (2) that remark was not brought within the limitations period by virtue of the continuing violation doctrine.[17] While Judge Sifton concluded that there was insufficient evidence to find that defendant Gleeson's alleged racially charged remark was related to any other instances of discrimination alleged by plaintiff, the issue was an arguable question of law, and plaintiff could reasonably have brought suit premised on the belief that a continuing violation could be established. Accordingly, I decline to find that plaintiff's NYCHRL hostile work environment claim was frivolous, unreasonable or groundless.

### D. Title VII and NYCHRL Retaliation Claim

Retaliation in violation of Title VII occurs when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause . . . [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the [adverse action] exist." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993). To make out a *prima facie* case of retaliation, a plaintiff employee must demonstrate: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 546-47 (E.D.N.Y. 2003) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998),

---

[17] "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Clark v. State*, 754 N.Y.S.2d 814, 817 (4th Dep't 2003).

*abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). The standards for a retaliation claim under the NYCHRL are similar in all respects relevant to the present motion.[18]

Plaintiff contended that she established a *prima facie* case of retaliation because she was subject to a retaliatory termination approximately two months after participating in a protected activity: complaining to defendant Caroggio that employees of Italian origin were receiving preferential treatment during her meeting with him in May of 2005. In Judge Sifton's June 30, 2009 opinion, he concluded that even assuming plaintiff established a *prima facie* case for retaliation, defendant had proffered legitimate non-discriminatory reasons for her termination and thus he did not resolve whether plaintiff had met her initial burden of establishing a *prima facie* case. Addressing that question directly for the first time, I find that plaintiff did establish a *prima facie* case for retaliation. It is undisputed that plaintiff is a member of a protected class, that she was subjected to an adverse employment action, and that that action was temporally proximate to her alleged protected activity. The temporal proximity between a complaint and termination is sufficient to support an inference of causation. *See Uddin v. City of New York*, 427 F. Supp. 2d 414, 432 (S.D.N.Y. 2006) (causation "can be established by showing that the retaliatory action was close in time to the protected activity") (citing *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)); *see also Harrison v. N. Shore Univ. Hosp.*, No. 04-CV-2033, 2008 WL 656674, at *12 (E.D.N.Y. Mar. 6, 2008) (one to two months sufficient to support inference

---

[18] "The standard for retaliation claims under the NYCHRL differs slightly from the Title VII standard in that there is no requirement in the New York City Code that the employee suffer a materially adverse action as a result of retaliation." *Schanfield v. Sojitz Corp. of Am.*, No. 07-CV-9716, 2009 WL 3149514, at *34 (S.D.N.Y. Sept. 30, 2009). Because the parties do not dispute that plaintiff's termination constituted an adverse action, this difference in the elements of a retaliation claim under NYCHRL is not relevant to the present dispute.

of causation).

While Judge Sifton concluded that defendants had offered a legitimate, non-discriminatory reason for terminating plaintiff's employment, plaintiff could have reasonably believed that defendants' reasons for terminating her were not credible. Because plaintiff established a *prima facie* case and had a reasonable basis for alleging that that she was subject to retaliation, it cannot be said that her claim was "frivolous, unreasonable, or groundless" or "clearly meritless." *See Betts v. Sperry Div. of Sperry Rand Corp.*, 556 F. Supp. 562, 567 (E.D.N.Y. 1983) (finding award of attorneys' fees not warranted where plaintiff made out a *prima facie* case of discrimination); *Logan v. St. Luke's-Roosevelt Hosp. Ctr.*, 636 F. Supp. 226 (S.D.N.Y. 1986) (denying fees to prevailing defendant because, while defendants provided "overwhelming evidence" to show that plaintiff was fired "because of honest dissatisfaction with her performance," plaintiff had established a *prima facie* claim) *aff'd without op.*, 805 F.2d 391 (2d Cir. 1986)). *See also Wrenn v. Gould*, 808 F.2d 493, 505 (6th Cir. 1987) (declining to award fees to prevailing defendant where plaintiff established a *prima facie* case of retaliatory non-hiring, despite finding plaintiff's litigiousness "troubling" and "alarming.").

### III. Defendants' Request for Fees and Costs

Defendant seeks $685,065.19 in fees and costs. That figure is alleged to represent fees and costs incurred since November 29, 2006, the date on which plaintiff filed her Complaint in federal court. It does not include $46,638.67 in fees and costs incurred with the SDHR proceeding or those fees incurred in connection with the instant application for fees. Bart Aff. ¶ 26.

### A. Availability of Partial Recovery of Fees

At issue is whether defendants may recover fees attributable to plaintiff's frivolous claim notwithstanding the fact that some claims were not frivolous. In *Colombrito v. Kelly*, 764 F.2d 122, 132 (2d Cir. 1985) the Second Circuit held that where plaintiff's frivolous and non-frivolous claims are "closely intertwined," and any increase in litigation costs due to the frivolous claim was minimal or impossible to quantify, a prevailing defendant is not entitled to any fees. However, where plaintiff brings a number of distinctly separate claims, some of which are frivolous, the defendant may recover for the frivolous claims even if the plaintiff ultimately prevails on other claims. *See Hensley v. Eckerhart*, 461 U.S. at 435 n.10 (asserting in dicta that partial recovery of fees by prevailing defendants is possible, at least in some circumstances).[19] Accordingly, I address whether plaintiff's claims are sufficiently "intertwined" such that attorneys' fees are not warranted despite the presence of at least one frivolous or clearly meritless claim. The Supreme Court in *Hensley*, although confronted with the distinct circumstance in which a plaintiff seeks recovery of fees but has only prevailed on some claims, explained that when claims arise from a common set of facts, they will generally be "sufficiently intertwined" such that that the plaintiff will be considered to have succeeded so long as he prevailed on (or in this case, had a non-frivolous basis for bringing) at least some claims:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. . . .[but] [i]t may well be that cases involving such unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases

---

[19] Other circuits are not consistent. The Sixth Circuit has held that attorneys' fees may not be awarded to defendants where the plaintiff has asserted at least one non-frivolous claim. *See Balmer v. HCA, Inc.*, 423 F.3d 606, 617 (6th Cir. 2005). In contrast, the Ninth Circuit has held that the district court may parse meritorious from frivolous claims even where all claims arise from the same set of facts and award partial fees to a prevailing defendant. *See Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055 (9th Cir. 2006).

> the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims.

461 U.S. at 435. *Cf. Tutor-Saliba*, 452 F.3d at 1063 (awarding fees to prevailing defendant, but noting that "the legislative history behind § 1988 demonstrates Congress' intent to promote vigorous private enforcement of civil rights, and permitting district courts to parse out frivolous claims from a set of interrelated claims may chill such enforcement.") (citations omitted). I conclude that plaintiff's claims here, while premised on different grounds for relief, arise from a common core of facts and are not so "distinctly different" that an award of attorneys' fees to defendant would be warranted.[20]

## B. Defendants' Request for Costs

Defendants seek to recover costs incurred during this litigation. "Pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure, 'costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs.'" *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 100 (2d Cir. 2006) (citing Fed. R. Civ. P. 54(d)(1)). In the Second Circuit, the presumption in favor of granting costs to the prevailing party remains unchanged in a case brought under Title VII. *Perks v. Town of Huntington*, No. 08-2123-cv, 2009 WL 1459502 (2d Cir. May 27, 2009); *see also Whitfield v. Scully*, 241 F.3d 264, 272-73 (2d

---

[20] That defendants have not distinguished the portion of their fees relating to plaintiff's various claims further evidences the relatedness of those claims. *See Henley*, 461 U.S. at 437 n.12 ("As for the future, we would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees in a suit in which plaintiffs were only partially successful if counsel's records do not provide a proper basis for determining how much time was spent on particular claims.") (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 279 (1st Cir. 1978)).

Cir. 2001) ("good faith and the absence of frivolous claims, by themselves, do not require a district court to deny costs.").[21] "After the prevailing party demonstrates the amount of its costs and that they fall within an allowable category of taxable costs, that party enjoys a presumption that its costs will be awarded." *Natural Organics, Inc. v. Nutraceutical Corp.*, No. 01 Civ. 0384 (GBD) (RLE), 2009 WL 2424188, at *2 (S.D.N.Y. Aug. 6, 2009) (citing *Patterson v. McCarron*, No. 99 Civ. 11078 (RCC), 2005 WL 735954, at *1 (S.D.N.Y. Mar. 30, 2005)). 28 U.S.C. § 1920 provides a list of items qualifying as "costs"[22] and grants discretion to a judge or to the clerk of court "to tax costs against the losing party in any federal litigation." Local Civil Rule 54.1. of the Eastern District of New York further provides that:

> Within thirty (30) days after the entry of final judgment, or, in the case of an appeal by any party, within thirty (30) days after the final disposition of the appeal. . . any party seeking to recover costs shall file with the clerk a request to tax costs annexing a bill of costs and indicating the date and time of taxation. Costs will not be taxed during the pendency of any appeal. . . . The bill of costs shall include an affidavit that the costs claimed are allowable by law, are correctly stated and were necessarily incurred. Bills for the costs claimed shall be attached as exhibits.

Local Civil Rule 54.1(a).

The costs that a party may recover are strictly limited to those listed in 28 U.S.C. § 1920,

---

[21] At least one court outside of this district has held otherwise. *See Waldemar v. Am. Cancer Soc.*, Civ. A. No., 1:94-CV3178J.F., 1996 WL 376381 (N.D. Ga. Mar. 28, 1996) ("prevailing defendants [in civil rights actions] are awarded fees and costs only if the action was frivolous and unreasonable").

[22] 28 U.S.C.A. § 1920 provides:

A judge or clerk of any court of the United States may tax as costs the following:
(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

absent some other contractual or statutory basis for allocating expenses to the losing party. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC.*, No. 04 Civ. 9651 (KNF), 2007 WL 4326110 (S.D.N.Y. Dec. 4, 2007) ("a district court does not have discretion, under Fed. R. Civ. P. 54(d), to tax as costs expenses incurred beyond those specified as taxable by Congress in 28 U.S.C. § 1920." (citing *Whitfield*, 241 F.3d at 269)). Accordingly, while courts awarding attorneys' *fees* to a prevailing party may include "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients," such disbursements falling outside of 28 U.S.C. § 1920 are properly considered reimbursable as a component of attorneys' *fees*, rather than costs, and are not recoverable as of course absent a basis to shift attorneys' fees to the losing party. *See, e.g., J.S. Nicol, Inc. v. Peking Handicraft, Inc.*, 03 Civ. 1548 (GBD), 2008 WL 4613752 at *18 (S.D.N.Y. Oct. 17, 2008).[23]

Defendants' request for costs is procedurally defective under Local Rule 54.1 in that: (1) defendants have failed to file their request for costs with the Clerk's Office; and (2) defendants did not attach an affidavit that the costs are allowable by law. While "a district court has broad discretion to determine whether to overlook a party's failure to comply with local rules," *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 108 n.2 (2d Cir 2006), and courts have in some cases granted costs despite the above defects, *see, e.g., Howell v. NYC Leadership Academy, Inc.*, No. 05 Civ. 8233 (JGK), 2008 WL 5336891, at *2 (S.D.N.Y. Dec. 20, 2008), I decline to award costs because of a further defect: defendants have failed to provide a clear list of the compensable

---

[23] Even in a case where a party is entitled to reasonable out of pocket expenses pursuant to a fee-shifting provision or other statutory or contractual basis, a party may not recover for items which constitute "routine office overhead." *See LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998). Because there is no basis for an award of attorneys' fees, I do not reach the question of whether any expenses qualify as "routine office overhead" here.

costs incurred. The affidavit of Hollis Gonerka Bart affixes a set of itemized bills provided to

defendant, totaling some 200 pages. The affidavit makes no effort to separate attorneys' fees

from costs, identify those costs which defendant believes are compensable under Rule 54(d), or

provide a total of the costs incurred. Further, the majority of the costs listed are clearly not

taxable under 28 U.S.C. § 1920.[24] Accordingly, defendants' request for costs is denied, without

prejudice to a renewed application that complies with Fed. R. Civ. P 54(d) and Local Rule 54.1.

## IV. Plaintiff's Request For Leave To Move For Fees Incurred In Responding to the Present Motion

Plaintiff requests leave to move for fees incurred in responding to the present motion,

contending that (1) plaintiff's underlying claims are not frivolous; and (2) defendants' contention

that plaintiff's claims are frivolous is itself frivolous, and would support the award of fees.

Because I find that plaintiff's claims were at least in part clearly meritless, plaintiff's request for

leave is denied.

## CONCLUSION

For the reasons set forth above, defendants' motion for attorneys' fees is denied.

Defendants' motion for costs is denied, without prejudice to a renewed application consistent

with the applicable federal and local rules. Plaintiff's request for leave to seek fees is denied.

---

[24] These include items identified as "Lexis-Nexis" fees, "Meeting Expenses," "Couriers," "Fares and Travel," "After Hours Expenses," "Expert Fees," "Telephone/Fax Charges" "Outside Professional Services," "American Express," and "West Payment Center." In addition, the court has not been provided with sufficient information to determine if any photocopies are compensable under § 1920. *See* 28 U.S.C. § 1920(4) (permitting taxation of "[f]ees for exemplification and the costs of making copies of any materials *where the copies are necessarily obtained for use in the case.*") (emphasis added). *See also* Local Rule 54.1 ("A copy of an exhibit is taxable if the original was not available and the copy was used or received in evidence. The cost of copies used for the convenience of counsel or the court are not taxable.").

The Clerk is directed to transmit a copy of the within to the parties and the magistrate judge either electronically through the Electronic Case Filing (ECF) system or by mail.

SO ORDERED.

Dated:      Brooklyn, New York
April 2⁄, 2010

By   s/Hon. Carol B. Amon
      Carol Bagley Amon
      United States District Judge